## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CHRISTOPHER M. COOPER,**
*Administrator of the Estate of*
*Deaunte Bell-McGrew,*

                                :

        **Plaintiff,**

      v.

**CITY OF COLUMBUS, OHIO,**    :
*et al.,*

        **Defendants.**

**Case No. 2:19-cv-3105**
**Judge Sarah D. Morrison**
**Magistrate Judge Elizabeth A.**
**Preston Deavers**

## OPINION AND ORDER

This matter is before the Court for consideration of the Motion for Summary Judgment filed by Defendants, the City of Columbus, Officer Matthew Baase, and Officer John Narewski. (Mot., ECF No. 27.) Plaintiff Christopher M. Cooper, Administrator of the Estate of Deaunte Bell-McGrew, responded (Resp., ECF No. 31), and Defendants replied (Reply, ECF No. 32). Mr. Cooper also filed a Motion for Leave to File Sur-Reply in Response to Defendants' Reply. (ECF No. 33.) Both motions are ripe for consideration. For the reasons set forth below, Mr. Cooper's Motion for Leave to File a Sur-Reply is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

On October 29, 2015, Officers Matthew Baase and John Narewski shot Deaunte Bell-McGrew a total of six times, killing him. This suit arises from the

series of events preceding his death. The case is tragic. With very little imagination, one can see a version in which Deaunte Bell-McGrew walks away from their encounter alive. But the Court is duty-bound to apply the law as it stands to the facts as they are. It endeavors to do so here.

Although the Court must construe all disputed facts in the light most favorable to the plaintiff, *Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008), they are discussed from all relevant perspectives in the section that follows.

### A. Factual Background

Officer Baase joined the Columbus Division of Police ("CDP" or the "Division") in June 2000. (Baase Dep., 14:12, ECF No. 27-2.) Officer Narewski joined the following summer. (Narewski Dep., PAGEID # 855, ECF No. 27-6.) In October 2015, both men were patrol officers assigned to Community Response Team Two. (Baase Dep., 37:6–17; Narewski Dep., 21:22–24.) The Community Response Team ("CRT") is a "multi-tool" within the Division—if there is "something they want done, but they don't know who to give it to," the assignment often goes to CRT. (Narewski Dep., 31:9–13.) Assignments range from working protests or community events, to liaising with neighborhood block watch groups, to "work[ing] the problematic areas of the city, working the violent crimes, the weapons, narcotics." (*Id.*, 31:14–20.)

On the evening of October 29, 2015, CRT Two was assigned to patrol the East side of Columbus—including certain "areas that were known to be high crime areas," like Amberly Square Apartments (Baase Dep., 57:12–22, 53:19–23; Narewski Dep., 40:7–22, 90:7–12; Kasza Dep., 9:20–10:4, ECF No. 27-5.) The five

2

officers comprising CRT Two during that shift—Baase, Narewski, Coleman, Kasza, and Tobin—agreed to stay within "a couple of blocks" from one another "to be able to assist" if necessary. (*Id.*, 54:4–14. *See also* Tobin Dep., 11:16–18, 12:1–5, ECF No. 27-7.) That night, Officers Baase and Narewski rode in one cruiser, Officer Tobin in a second, and Officers Coleman and Kasza in a third. (Tobin Dep., 15:20–23.)

At approximately 9:20pm, Officers Baase and Narewski were driving through Amberly Square when they observed a single car legally parked in a roundabout. (Baase Dep., 58:8–10, PAGEID # 356.) The vehicle's windows were tinted. (*Id.*, 58:15; Narewski Dep., 93:7–8.) The Officers activated the cruiser spotlight and observed three people inside. (Baase Dep., 58:11–13, Narewski Dep., 93:8–9.) They decided to approach the occupants—a "consensual encounter"—and parked the cruiser at an angle alongside the car. (*See* Narewski Dep., 93:19–21; Baase Dep., PAGEID # 372.) Officer Baase approached the front passenger side, where Luis Corchuelo was seated. (Baase Dep., 66:25–67:1. *See also* Coleman Aff., ECF No. 27-10.) Officer Narewski approached the driver, Lovita Cosby. (Narewski Dep., 93:24. *See also* Coleman Aff.) Mr. Bell-McGrew sat in the back seat behind Ms. Cosby. (Baase Dep., 67:11–12.) Both Officers had flashlights in-hand.

As he approached Ms. Cosby's window, Officer Narewski "could smell the odor of burnt marijuana in the air." (Narewski Dep., 91:9–10.) He "couldn't tell if it was coming from inside the motor vehicle or [if] somebody had stood right outside the motor vehicle and smoked marijuana." (*Id.*, 94:2–4.) Ms. Cosby rolled down her window, and Officer Narewski asked if they were smoking marijuana. (*Id.*, 105:16.)

Ms. Cosby responded, "[Y]ou mean this very moment?" and, in Officer Narewski's

recollection, the two "kind of chuckled and laughed." (*Id.*, 105:17–18.) Officer Baase

"remembers there being an odor" as he approached the car, but "couldn't determine

that it was marijuana." (Baase Dep., 75:22–24.)

While Officer Narewski was speaking with Ms. Cosby, Officer Baase observed

Mr. Bell-McGrew "reaching down between his legs with his right hand." (*Id.*, 67:13–

14.) He directed Mr. Bell-McGrew "[t]o bring his hands back up on to his lap, or his

knees, . . . where [Officer Baase] could see them." (*Id.*, 67:14–17.) A few moments

later, Officer Baase "noticed [Mr. Bell-McGrew] reaching down toward the floor

board again." (Id., 68:1–2.) Officer Narewski saw it, too:

> I angled myself at this point so I could see [Ms. Cosby] and somewhat
> look into the back seat. I could see that he was moving around a lot,
> and that's when I had asked him to place his hands [on the headrest in
> front of him]. . . . He kept going, like dipped down in the seat, kind of
> like sliding to the right and dipping down with his right hand.

(Narewski Dep., 113:9–25.)

Although Mr. Bell-McGrew initially complied with the Officers' instructions,

Officer Narewski had to repeat them "a couple of times." (*Id.*, 114:21–22.) Officer

Narewski then opened the rear driver's side door, where Mr. Bell-McGrew was

seated:

> As I came around, you know, I told him to calm down. I said just keep
> your hands up where I could see them, at which point he dipped back
> down into the seat again. He looked over at me, and was like, "You've
> got no fucking right." At some point I grabbed his left hand. I could feel
> that he was really tense. I told him to relax, calm down. He was kind of
> yelling at me at that point, at which he turned toward me. I recognized
> his face. I couldn't tell you his name. I couldn't tell you exactly when I
> had dealt with him, but I knew him from the neighborhood.

4

> And then I basically said, "Hey, calm down. You know me, I know you. Just relax. This isn't a big deal." He was very agitated he kept yelling, yelling like, "Fuck you, you don't have any right." I kept trying to calm him down, and I repeated my statement a couple of times.

(*Id.*, 114:22–115:14 (cleaned up).)

Ms. Cosby's recollection of similar, but different, dialogue casts the exchange in another light. In an interview with homicide detectives immediately after the incident, Ms. Cosby reported hearing Officer Narewski say to Mr. Bell-McGrew, "I know who you are." (ECF No. 31-2, PAGEID # 1371.)

During this time, Officer Baase observed Mr. Bell-McGrew turn towards Officer Narewski, when "the right pocket of his zip up sweatshirt fell open." (Baase Dep., 69:5–7.)

> When that pocket opened up to my view I could see what I recognized was the butt plate of a handgun. I wanted to be sure that even though I recognized it immediately I wanted to double check, so I adjusted my flashlight and was able to see that it was a handgun in his pocket, which had been concealed from us from the beginning of the encounter.

(*Id.*, 69:7–14.) Officer Baase then "made Officer Narewski aware that [Mr. Bell-McGrew] had a handgun." (*Id.*, 69:14–15.) Officer Baase testified that he "stated, 'John, he's got a gun.'" (*Id.*, 69:17.) Officer Narewski paints a more panicked scene, recalling that his "partner yelled 'gun.'" (Narewski Dep., 115:14.)

Mr. Bell-McGrew then pulled away from Officer Narewski. As Officer Baase described it,

> [Mr. Bell-McGrew] with both of his hands pulled violently away from Officer Narewski and reached for the right pocket, [where] the pistol was[.] . . . Officer Narewski had his grip on his wrist, and did not relinquish that grip and was pulled in by [Mr. Bell-McGrew] reaching for his pocket.

5

(Baase Dep., 81:9–12, 85:9–12.) Officer Narewski similarly recounted,

> Mr. Bell[-McGrew] broke back into the car. I was fearful that he was
> going for the gun. I'm not really sure if I got dragged in or went in on
> instinct, but my whole goal was to brace that left hand and try to get
> ahold of his right hand to prevent him from getting the gun, or if he
> already had the gun, prevent him from using the gun.

(Narewski Dep., 115:15–21.)

Mr. Bell-McGrew and Officer Narewski began wrestling, "nose-to-nose," in
the back seat of Ms. Cosby's car. (Baase Dep., 86:3–5.) To Officer Baase, who
watched through the passenger-side window, "[i]t appeared that Officer Narewski
was wrestling trying to get control of [Mr. Bell-McGrew's] arms." (*Id.*, 86:9–11.)
Officer Baase then saw Officer Narewski "push himself up," creating space between
his and Mr. Bell-McGrew's torsos. (*Id.*, 91:3–6.) Officer Baase fired his weapon at
Mr. Bell-McGrew, shattering the window. (*Id.*, 96:3–5.) The bullet struck Mr. Bell-
McGrew on the right side of his upper back. (Bauer Report, ECF No. 31-3, PAGEID
# 1390.)

Officer Narewski heard the shot and felt glass hit his face, but did not know
whether Mr. Bell-McGrew or his partner had fired. (Narewski Dep., 154:13–18.)
Officer Narewski then stepped backwards out of and away from the car to "put some
distance" between himself and Mr. Bell-McGrew. (*Id.*, 155:1–5.)

What happened in the next few seconds is unclear. Officer Narewski recalls
Mr. Bell-McGrew stepping out of the car and turning quickly towards him. (*Id.*,
155:7–11.) Officer Baase recalls seeing the top of Mr. Bell-McGrew's head above the
door frame. (Baase Dep., 97:17–18.) And Mr. Corchuelo believes Mr. Bell-McGrew
might have said "something about 'chill out' or 'I'm getting out'" as Officer Narewski

fell back. (ECF No. 32-1, PAGEID # 1377.) What is undisputed, is that, within five seconds of Officer Baase firing, Officer Narewski shot Mr. Bell-McGrew five times, inflicting the fatal wound. (Baase Aff., ECF No. 27-9; Bauer Report, PAGEID # 1388–93.)

### B. Procedural Background

Mr. Cooper first filed suit in this Court in 2017. *See Cooper v. City of Columbus*, Case No. 2:17-cv-948-SDM-EPD (S.D. Ohio, Complaint filed Oct. 26, 2017). Before the 2017 case materially progressed, the parties agreed to a dismissal without prejudice. *See id*. (Stipulation of Dismissal filed July 18, 2018).

Mr. Cooper refiled suit in 2019. (ECF No. 1.) His Amended Complaint, the operative pleading, names as defendants the City of Columbus, Officer Baase, and Officer Narewski, and asserts four claims:

- **Count I:** Unreasonable Seizure (Officers Baase and Narewski)
- **Count II:** Unconstitutional Custom or Policy (City)
- **Count III:** Wrongful Death (Officers Baase and Narewski)
- **Count IV:** Survivorship (Officers Baase and Narewski[1])

(Am. Compl., ECF No. 16.) Defendants have moved for summary judgment on all claims.

## II. MOTION FOR LEAVE TO FILE A SUR-REPLY

Mr. Cooper moves for leave to file a sur-reply responding to "new arguments" made in Defendants' reply memorandum. In particular, he seeks an opportunity to

---

[1] Mr. Cooper clarified in his Response that he "does not assert state law claims against Defendant City of Columbus." (Resp., 39 n.7.)

respond to (i) Defendants' argument that Officers Baase and Narewski acted in "self-defense or defense of another" so their conduct cannot be considered intentionally tortious under state law (the "State Law Issue") and (ii) Defendants' objection to the form in which Mr. Cooper offers witness recollection of Mr. Bell-McGrew's statements during the incident (the "Hearsay Issue"). Defendants oppose Mr. Cooper's motion only as to the State Law Issue.

It is well-established that "a reply brief is not the proper place to raise an issue for the first time." *United Tel. Co. of Ohio v. Ameritech Servs., Inc.*, No. 2:10-cv-249, 2011 WL 53462, at *3 n.2 (S.D. Ohio Jan. 7, 2011) (Frost, J.) (citing *Lexion, Inc. v. Safeco Ins. Co. of Am.*, 436 F.3d 662, 676 (6th Cir. 2006) (Griffin, J., concurring in part)). However, the State Law Issue was not raised for the first time in Defendants' reply brief—it flows from the argument in Defendants' Motion for Summary Judgment that Ohio Rev. Code § 2307.60(B)(2) bars Counts III and IV. Mr. Cooper's Motion is **DENIED** to the extent it seeks to respond to the State Law Issue.

Defendants concede that the Hearsay Issue was first raised in their reply, as they did not rely on the evidence to which the hearsay objection was made. By granting Mr. Cooper leave to file a sur-reply on the Hearsay Issue, the Court will be afforded an opportunity to fully consider the hearsay rules' impact on the evidence Mr. Cooper submits in support of his Response. *See NCMIC Ins. Co. v. Smith*, 375 F. Supp. 3d 831, 836 (S.D. Ohio 2019) (Sargus, J.) (explaining that "there is a strong preference that claims be adjudicated on the merits") (internal quotations and

8

citation omitted). Accordingly, Mr. Cooper's Motion is **GRANTED** to the extent it seeks to respond to the Hearsay Issue. Mr. Cooper's sur-reply (ECF No. 33-1) is considered for that purpose. The Court turns now to the merits.

## III.    MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that

summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

### A.    Count I – Unreasonable Seizure

Officers Baase and Narewski raise the defense of qualified immunity to Mr. Cooper's unreasonable seizure claim. "When the defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment." *Davenport*, 521 F. 3d at 550. Qualified immunity is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). An official is entitled to the defense of qualified immunity so long as he has not violated a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The analysis typically involves two steps: (1) determine "whether the facts . . . shown . . . make out a violation of a constitutional right," and (2) determine whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Because the Court finds that the facts do not make out a violation of Mr. Bell-McGrew's constitutional rights, it need not and does not move on to the second step. *See Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) ("These two prongs [(steps)] may be addressed in any order. If either prong is not met, then the government officer is entitled to qualified immunity") (citation omitted).

10

Mr. Cooper alleges that Officers Baase and Narewski violated Mr. Bell-McGrew's rights under the Fourth Amendment to the United States Constitution. The Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

> [T]he Fourth Amendment divides police-citizen interactions into three tiers, which must be justified by correspondingly increasing levels of suspicion: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause."

*Bey v. Falk*, 946 F.3d 304, 312 (6th Cir. 2019) (quoting *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)). Mr. Bell-McGrew's Fourth Amendment rights were implicated at three points: (i) the Officers approaching the car to conduct a consensual encounter; (ii) Officer Narewski opening the back door to the car and grabbing Mr. Bell-McGrew's wrist; and (iii) the Officers' use of deadly force against Mr. Bell-McGrew. Defendants argue that none of these acts violated Mr. Bell-McGrew's rights. (*See* Mot., 9–24.) As to the Officers' approach, Mr. Cooper does not argue otherwise. (*See* Resp.) The Court will therefore focus on whether Mr. Bell-McGrew's rights against unreasonable seizure were violated by Officer Narewski opening the door and grabbing his wrist, or the Officers' use of deadly force against him.

11

### 1. *Terry* Stop

Mr. Cooper characterizes Officer Narewski's conduct—*i.e.*, opening the back door of Ms. Cosby's car and grabbing Mr. Bell-McGrew's wrist—as an investigative detention, also referred to as a *Terry* stop. (Resp., 30–32.) *See also Terry v. Ohio*, 392 U.S. 1, 20–21 (1968). To determine the reasonableness of a *Terry* stop, this Court must engage in a two-part analysis: "We first ask whether there was a proper basis for the stop and, if the stop was proper, then we must determine whether the degree of intrusion was reasonably related in scope to the situation at hand." *Smith*, 594 F.3d at 536 (internal quotations and citations omitted) (cleaned up).

*Terry* "permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). The Sixth Circuit has explained,

> "[r]easonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011). This standard requires "more than a mere hunch," but at the same time "is satisfied by a likelihood of criminal activity less than probable cause" and far less than "a preponderance of the evidence." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir. 2006)). "In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005).

*Bey*, 946 F.3d at 313. Although an officer's "inchoate and unparticularized suspicion[s]" are not to be given weight, courts should consider "the specific

reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

The record establishes that Officer Narewski had reasonable suspicion sufficient to conduct a *Terry* stop. Ms. Cosby's car was parked in a high-crime area, known to have "a lot of gang activity . . . , a lot of narcotic activity[,] multiple shootings, some officer involved. The area was notorious for robberies." (Narewski Dep., 90:7–12.) It was "one of [the] spots that [he] check[ed] on a regular basis." (*Id*.) Nonetheless, Officer Narewski concedes that "prior to exiting the [cruiser], [he] didn't have any reasonable suspicio[n] to think that any criminal activity was afoot[.]" (*Id*., 95:1–3.) But as he "walked up [to Ms. Cosby's car, he] could smell the odor of burnt marijuana in the air." (*Id*., 91:9–10.) He couldn't tell where the odor was coming from, but he "did not observe any other individuals or vehicles that could have been the source of the odor[.]" (Narewski Aff., ¶ 6.) Officer Narewski proceeded to ask Ms. Cosby if she and her passengers were smoking. (Narewski Dep., 105:15.) Prior to opening Mr. Bell-McGrew's door, Officer Narewski "asked him a couple of times" to put his hands on the headrest in front of him. (*Id*., 114:21.) As he approached the door, Officer Narewski told Mr. Bell-McGrew, "keep your hands up where I could see them, at which point he dipped back down into the seat again." (*Id*., 114:22–25.) These movements led Officer Narewski to believe Mr. Bell-McGrew "was armed" or "was trying to hide some type of contraband." (*Id*., 118:24–119:1.) When Officer Narewski opened the door and grabbed Mr. Bell-McGrew's wrist, he "believed [Mr. Bell-McGrew] had a weapon." (*Id*., 118:15.) In his words, "I

didn't see it, couldn't act on it, but through my experience, my training, the other arrests that I've made, I believed at that point he was armed." (*Id.*, 118:19–21.)

This combination of circumstances clears the bar for reasonable suspicion. In *United States v. Coker*, the Sixth Circuit stated:

> [T]his court and others have concluded that these kinds of movements [("leaning forward," "reaching into the backseat," and "digging around" after being directed to stop moving)] in a car (in combination with other factors) may provide an officer with reasonable suspicion of ongoing criminal activity. *E.g., United States v. Carr*, 674 F.3d 570, 572, 574 (6th Cir. 2012) ("bending toward the middle console"); *United States v. Campbell*, 549 F.3d 364, 369, 371 (6th Cir. 2008) ("slouch[ing] down . . . with his hands out of sight"); *United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) ("[a] dip with his right shoulder toward the floor"); *United States v. Bailey*, 302 F.3d 652, 659 (6th Cir. 2002) ("reaching"); *see also, e.g., United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) ("stuffing movements toward the seat"); *United States v. Bell*, 480 F.3d 860, 862, 864 (8th Cir. 2007) ("reach[ing] back"). . . . Coker's movements were more suspicious than the movements in many of these cases because Coker continued to move even after being told not to do so. *See United States v. Mays*, 643 F.3d 537, 540–43 (6th Cir. 2011); *see also United States v. Holmes*, 385 F.3d 786, 789–90 (D.C. Cir. 2004) (Roberts, J.).

648 F. App'x 541, 544 (6th Cir. 2016). The same analysis applies here, and warrants the same conclusion: Officer Narewski had a proper basis for the *Terry* stop. Similarly, the degree of intrusion—opening the car door and grasping Mr. Bell-McGrew's wrist, while asking him to step out of the vehicle—was reasonably related in scope to the situation at hand.[2]

---

[2] Viewing the facts in the light most favorable to Mr. Bell-McGrew, it is clear (and understandable) that Officer Narewski's decision to go hands-on right out of the gate alarmed Mr. Bell-McGrew and urgently escalated tensions between the two. But the Court's task is to draw a conclusion as to the constitutionality of Officer Narewski's tactics—not as to their wisdom. *Cf. Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 343 (6th Cir. 2016) (explaining that "plaintiffs 'cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly

Mr. Cooper argues, in opposition, that the *Terry* stop was improper because Officer Narewski's detection of burnt marijuana is "disputed" and because that smell alone did not justify Officer Narewski making physical contact with Mr. Bell-McGrew. (Resp., 31.) The argument fails. Though it may be *uncorroborated*, it is not *disputed* that Officer Narewski smelled marijuana smoke. Any metaphysical doubt raised by Mr. Cooper's suggestion that Officer Narewski used the odor of marijuana as a pretext to engage with Mr. Bell-McGrew is an insufficient basis upon which to deny summary judgment. What's more, Mr. Cooper's argument does not address the Officers' accounts that Mr. Bell-McGrew engaged in continued, disquieting movements in the dark back seat, which gave rise to Officer Narewski's belief that he was armed.

### 2. Deadly Force

Mr. Cooper further alleges that the Officers violated Mr. Bell-McGrew's constitutional rights by using excessive force against him. Excessive force claims are also analyzed under the Fourth Amendment's protection against unreasonable seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. The court "must balance the consequences to the individual against the government's interests in effecting the seizure." *Burchett v. Kiefer*, 310 F.3d 937,

---

confrontation that could have been avoided'") (quoting *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015)).

944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). The Supreme Court has recognized that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

Courts have long held that the use of deadly force is objectively reasonable only when an officer has "probable cause that the suspect poses an imminent danger of serious physical harm to the officer or to others." *Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007) (emphasis omitted). Though "the ultimate question . . . is whether [an officer's] decision to use deadly force . . . was reasonable under the totality of the circumstances," *Mitchell v. Schlabach*, 864 F.3d 416, 422 (6th Cir. 2017) (citation omitted), particular attention is paid to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

And so, the Court next considers whether the evidence presented demonstrates that, at the time of the shooting, Officers Baase and Narewski had probable cause to believe that Mr. Bell-McGrew posed an imminent threat of causing serious physical harm. In accordance with Sixth Circuit precedent, the inquiry focuses on the moments preceding each Officer's use of deadly force. *See Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996).

16

### a)    Officer Baase

In those crucial moments before firing his weapon, Officer Baase observed a

handgun concealed in Mr. Bell-McGrew's sweatshirt pocket. (Baase Dep., 77:23–

78:13.) He alerted Officer Narewski, who was standing at the open door, engaged

with Mr. Bell-McGrew. (*Id.*, 79:21–80:10.) In a "matter of seconds," Officer Baase

observed Mr. Bell-McGrew, "with both of his hands pull[] violently away from

Officer Narewski and reach[] for the right pocket," where he saw the handgun. (*Id.*,

81:8–12.) He explained,

> It was my belief from when Mr. Bell[-McGrew] pulled away from
> Officer Narewski and used both hands to reach for the pocket that was
> containing the firearm, it was my belief that he was attempting to
> retrieve that firearm. When I had seen the firearm in his pocket and
> confirmed that's what I had seen I had drawn my weapon, my sidearm.
> As the struggle went on in the back seat it was my belief that Mr.
> Bell[-McGrew] was attempting to get ahold and use that firearm
> against my partner and myself. I determined at that point that I
> needed to use force to stop Mr. Bell[-McGrew] from doing so. As the
> struggle continued with Mr. Bell[-McGrew], I could see his arm down
> toward that pocket still, and I believed he was still attempting to
> retrieve that firearm[.]

(*Id.*, 90:14–91:3.) When Officer Baase saw Officer Narewski "push himself up," he

fired. (*Id.*, 91:3–6.)

In short, Officer Baase watched from close range while his partner wrestled,

prone in the backseat of a car, "nose-to-nose" with an individual he knew to be

armed and had reason to believe was dangerous. A reasonable officer, facing these

circumstances, would believe himself and his partner to be in imminent danger of

serious physical harm. *Cf. Wilkerson v. City of Akron, Ohio*, 906 F.3d 477, 482–83

(6th Cir. 2018) (upholding grant of qualified immunity to police officer who shot

17

individual after tussle during which individual's concealed weapon discharged, even when fleeing, in part because he still had the weapon "and nothing prevented [him] from turning to fire upon the officers").

Mr. Cooper argues that Officer Baase is not entitled to qualified immunity because Mr. Bell-McGrew never posed an imminent threat of serious bodily harm. (Resp., 28.) Mr. Cooper offers several facts and factors in support of his argument. None is successful. First, he notes that Mr. Bell-McGrew never drew or brandished the gun. (*Id.*) But doing so is not a necessary precondition for using deadly force. *See Wilkerson*, 906 F.3d at 483. Mr. Cooper next argues that Officer Baase's perception that Mr. Bell-McGrew was "going for the gun" requires an unwarranted determination that he is a credible witness. (Resp., 28.) Though Mr. Cooper bears the burden of proving that Officer Baase is not entitled to summary judgment, *see Davenport*, 521 F.3d at 550, he offers the Court no evidence disputing, conflicting with, or undermining Officer Baase's sworn testimony on this point. Third, Mr. Cooper notes that Melvin Tucker, a police practices expert, opined that Officer Baase used a greater level of force than other officers would have used in the same or similar circumstances. (Resp., 29.) Mr. Tucker rendered that opinion on the basis that Mr. Bell-McGrew "never had his hands on a weapon and never pointed a firearm at anyone before he was shot and killed." (Tucker Report, PAGEID # 1332, ECF No. 31-1.) Mr. Tucker's reasoning is inconsistent with Sixth Circuit caselaw. As explained above, grabbing or aiming a firearm are not necessary preconditions to using deadly force. Finally, Mr. Cooper argues that Officer Baase failed to issue a

18

verbal warning before firing, despite having the opportunity to do so. (Resp., 29.)
Although the Supreme Court has said that law enforcement should give a verbal
warning before using deadly force, the edict is expressly limited by feasibility.
*Garner*, 471 U.S. at 11–12 ("[I]f a suspect threatens the officer with a weapon . . .
deadly force may be used if necessary to prevent escape, and if, where feasible, some
warning has been given.") Despite Mr. Cooper's assertion otherwise, the Court finds
that it was not feasible for Officer Baase to warn Mr. Bell-McGrew of his intent to
fire. *See Wilkerson*, 906 F.3d at 483.

### b)   Officer Narewski

Determining whether Officer Narewski had sufficient probable cause to use
deadly force against Mr. Bell-McGrew overlaps with, but also expands upon, the
moments discussed above. Officer Narewski himself was in close quarters, with
limited-to-no visibility, wrestling with an individual he believed to be armed.
(Narewski Dep., 143:4–11.) A shot rang out—Officer Narewski described what
followed:

> I feel my face, what I believed was glass hit my face. I'm not sure. All I
> know is, I was able to sit up. I see a gun shot in the window with lights
> coming through. I don't know if Mr. Bell-[McGrew] has the gun, or
> Officer Baase shot. I just know at that point I'm going to get out of the
> car and fall back. I exited the vehicle. . . . I'm stepping backwards out
> of the motor vehicle, keeping my eye on the door where my threat is,
> and I'm stepping back to put some distance between myself because I
> had nowhere to go for cover, so I put distance between myself and Mr.
> Bell-[McGrew]. . . . At which point I draw my weapon out. I see Mr.
> Bell-[McGrew] get out of the car. He's crouched in a low position like
> he's in a low combat ready position making himself a small target. He
> quickly turns around. At some point I engage, I fire multiple shots
> from my weapon.

(*Id.*, 154:14–20, 155:1–13.)

19

Mr. Cooper argues that the record establishes a genuine issue of material fact precluding summary judgment as to Officer Narewski—specifically, that there is conflicting evidence and testimony about Mr. Bell-McGrew's position when he was shot and killed. Officer Narewski testified that Mr. Bell-McGrew was "outside the car." (*Id.*, 166:6–7.) Officer Baase gave consistent testimony, stating that "[he] saw the top of Mr. Bell[-McGrew's] head appear just above the frame of the vehicle" before Officer Narewski fired. (Baase Dep., 97:17–18.) But Officer Kasza testified that, when he arrived, Mr. Bell-McGrew was <u>seated</u> in the back of the car. (Kasza Dep., 27:2–10.) Officer Tobin found Mr. Bell-McGrew with his legs "still up on the floorboard of the rear driver's side compartment . . . , leaning out of the vehicle and onto the pavement." (Tobin Dep., 27:16–18.) Further, the forensic reconstructionist retained by Mr. Cooper opined that Officer Narewski's testimony "is inconsistent with . . . and directly contradicts" the physical evidence. (Bauer Report, PAGEID # 466.)

Mr. Cooper describes this question (whether Mr. Bell-McGrew "came out of the vehicle, crouched, and turned 'quickly' towards him") as "the key" to defending Officer Narewski's use of deadly force. (Resp., 34.) The Court cannot agree. Whether a reasonable officer on the scene would have probable cause to believe that Mr. Bell-McGrew posed an imminent threat of serious physical harm does not turn on whether his feet were in the car or on the ground—with firearms in play, the threat is the same.

Defendants' Motion for Summary Judgment is **GRANTED** as to Count I.

**B.    Count II – Unconstitutional Municipal Policy**

Section 1983 does not "incorporate doctrines of vicarious liability." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Accordingly, "[a] plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). However, "[n]o constitutional violation means no municipal liability." *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 367 (6th Cir. 2017) (citation omitted).

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Count II.

**C.    Counts III and IV – Wrongful Death and Survivorship**

Mr. Cooper also brings state law claims against Officers Baase and Narewski for wrongful death and survivorship. (Am. Compl., ¶¶ 101–10.) *See also* Ohio Rev. Code §§ 2125.01, 2305.21. The Officers argue that they are statutorily immune from these claims. (Mot., 40.) *See also* Ohio Rev. Code Ch. 2744. The Court agrees. As the Sixth Circuit has explained,

> Ohio provides statutory immunity from suit to its police officers unless, among other things, the officer's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Reckless conduct is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016).
>
> [The court has] endorsed the view that under Ohio law, "if the trier of fact were to find that [the decedent] posed no immediate threat of

21

harm to anyone else . . . then the officer's actions in shooting the decedent were reckless at best." *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011) (quoting *Carpenter v. City of Cincinnati*, No. C-1-99-227, 2003 WL 23415143, at *13 (S.D. Ohio Apr. 17, 2003)). And an Ohio appellate court has explained that the "relevant inquiry before the court [is] whether [the officer], from his own perspective, reasonably had probable cause to believe that he [was] at imminent risk of serious physical harm when he fired his weapon." *Hayes v. Columbus*, No. 13AP-695, 2014 WL 2048176, at *11 (Ohio Ct. App. May 15, 2014) (unreported).

*Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 676–77 (6th Cir. 2020). Having concluded that Officers Baase and Narewski did not violate the Fourth Amendment's "reasonableness" requirement, their culpability in tort cannot rise to a level outside of statutory immunity.

Defendants' Motion for Summary Judgment is **GRANTED** as to Counts III and IV.

## IV. CONCLUSION

For the reasons set forth above, Mr. Cooper's Motion for Leave to File a Sur-Reply (ECF No. 33) is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment (ECF No. 27) is **GRANTED** as to all of Mr. Cooper's claims against them. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**